**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Christine M. Arguello**

Civil Action No. 19-cv-00722-CMA

JOSHUA E. WINGFIELD,

      Applicant,

v.

TERRY JACQUES, Warden, A.V.C.F., and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.
_____

## ORDER DENYING APPLICATION FOR WRIT OF HABEAS CORPUS
_____

Applicant, Joshua E. Wingfield, has filed *pro se* an Application for a Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Doc. # 1) challenging the validity of his

criminal convictions in the District Court of Arapahoe County, Colorado. Having

considered the Respondents' Answer (Doc. # 52), Mr. Wingfield's Reply (Doc. # 63),

and the state court record, the Court denies the Application.

## I. BACKGROUND

In December 2009, Mr. Wingfield was convicted by a jury in Arapahoe County

District Court Case No. 07CR1653 of possession of a precursor for methamphetamine;

possession of chemicals or supplies to manufacture a Schedule II controlled substance;

and, conspiracy to manufacture and distribute a Schedule II controlled substance.

(State Court Record ("R"), Court File, at 1264).[1]  He was adjudicated a habitual criminal and sentenced to an aggregate 48-year prison term.  (*Id.*).  The Colorado Court of Appeals summarized Mr. Wingfield's trial court proceedings, in relevant part, as follows:

> The police found Wingfield hiding in the bathroom of an Aurora motel room.  In the room, officers found the tools and ingredients of a methamphetamine laboratory, including boxes of pseudoephedrine, coffee filters filled with pill binders, a hot plate, cookware, a propane torch, sandwich bags, rubber tubing, a digital scale, potassium iodide, acidic liquid tape, a funnel, and a pickle jar.

> The prosecution charged Wingfield with (1) possession of a precursor for methamphetamine or amphetamine; (2) possession of chemicals or supplies to manufacture a schedule II controlled substance; (3) conspiracy to manufacture and distribute a schedule II controlled substance; (4) conspiracy to commit possession of chemicals or supplies to manufacture a schedule II controlled substance; and (5) solicitation to commit possession of a precursor for methamphetamine or amphetamine.

> Prior to trial, in July 2007, the court ordered Wingfield to undergo a competency evaluation.  In October 2007, after reviewing the competency evaluation, which concluded that Wingfield was competent to stand trial, the trial court found him competent to proceed.  Wingfield subsequently requested, and was denied, a second competency hearing [on eight occasions between March 12, 2008 and December 15, 2009].

> Wingfield represented himself at trial.  Although he admitted being a longtime methamphetamine user and often associating with drug dealers, he claimed that he was in the motel room on the evening of his arrest not as part of a methamphetamine manufacturing operation, but rather to cook a meal for his friends.

> The jury convicted him of counts one through three, but acquitted him of counts four and five. . . .

---

1 For ease of reference, the Court's citation to page numbers in the state court record is to the page numbers reflected on the pdf.doc contained in the CD Rom submitted by the Arapahoe County District Court.

*People v. Joshua Elliot Wingfield* (*Wingfield I*), No. 12CA1286, (Colo. App. March 19, 2015) (unpublished) (Doc. # 10-5 at 3-5).

The Colorado Court of Appeals affirmed Mr. Wingfield's convictions. *Id.* The Colorado Supreme Court denied Mr. Wingfield's petition for certiorari review on September 21, 2015. (Doc. # 10-6).

Mr. Wingfield filed a motion for sentence reduction pursuant to Colo.Crim.P. Rule 35(b) on October 10, 2015, which was denied by the state district court on March 29, 2016. (R., Court File at 1410). He did not file an appeal.

Mr. Wingfield then filed a motion for post-conviction relief on December 1, 2016, which was denied by the state district court in June 2017. (*Id.* at 1449, 1581). The Colorado Court of Appeals affirmed in *People v. Joshua Elliot Wingfield* (*Wingfield II*), No. 17CA1566 (Colo. App. Feb. 28, 2019) (unpublished) (Doc. # 10-9). Mr. Wingfield did not request certiorari review by the Colorado Supreme Court.

Mr. Wingfield initiated this § 2254 proceeding on March 11, 2019. He asserts the following claims for relief in the Application:

(1) The state trial court violated Mr. Wingfield's Sixth and Fourteenth Amendment rights when the court failed to appoint counsel in his post-conviction proceeding and denied his *pro se* state post-conviction motion summarily, given his mental disabilities. (Doc. # 1 at 4-5).

(2) Pre-trial counsel[2] was constitutionally ineffective in: (a) failing to conduct a sufficient investigation and present evidence to support Mr. Wingfield's standing to challenge the search of the motel room; and/or, failing to file a motion to dismiss the charges of possession and conspiracy to manufacture for insufficient evidence (*id.* at 5-9); (b) failing to discover and present evidence to challenge the admission of prior bad acts evidence (*id.* at 10-13); (c) failing to conduct a sufficient investigation and present evidence to support

---

2 Mr. Wingfield represented himself at trial. (Doc. # 10-5 at 4).

Mr. Wingfield's incompetence (*id.* at 13-14); and, (d) in waiving Mr. Wingfield's presence at the incompetency hearing.   (*Id.* at 14-17).

(3) The trial court violated Mr. Wingfield's Fifth, Sixth and Fourteenth Amendments rights by failing to give him an adequate advisement on his right to testify.   (*Id.* at 9-10).

(4) The trial court violated Mr. Wingfield's Sixth and Fourteenth Amendment rights by allowing defense counsel to waive his presence at the competency hearing.   (*Id.* at 14-15).

(5) Direct appeal counsel was constitutionally ineffective in failing to raise the following issues on appeal: (a) trial court error in denying Mr. Wingfield's motion to suppress based on lack of standing; (b) trial court error in failing to grant Mr. Wingfield an extended proportionality review to challenge his sentence; (c) trial court error in denying Mr. Wingfield's plea of not guilty by reason of insanity (NGRI), and in forcing him to stand trial as an insane person; and, (d) juror misconduct/bias.   (*Id.* at 17-26).

In a Pre-Answer Response, Respondents conceded the timeliness of the Application under the one-year limitation period set forth in 28 U.S.C. § 2244(d).   (Doc. # 10 at 6).   Respondents further conceded that Mr. Wingfield exhausted state court remedies for claims 1 and 3.   (*Id.* at 9, 14).   Respondents argued, however, that sub-claims 2(a), 2(b), 2(c), 2(d), 5(a), 5(b), 5(c) and 5(d) were procedurally defaulted in the state courts.   (*Id.* at 10-14, 15-16).

In a June 12, 2019 Order, the Court dismissed claim 5 of the Application, in its entirety, as procedurally barred.   (Doc. # 24).   The Court directed Respondents to file an Answer that fully addressed the merits of Mr. Wingfield's properly exhausted claims 1, 3 and 4, and whether the procedurally defaulted ineffective assistance of counsel allegations in sub-claims 2(a) through 2(d) have substantial merit under *Martinez v. Ryan*, 566 U.S. 19 (2012).

Mr. Wingfield subsequently filed three motions to amend his § 2254 Application

to assert additional claims.   In a July 29, 2019 Order, the Court granted the motions in part, and denied them in part.   (Doc. # 42).   The Court deemed the § 2254 Application amended to include the following additional claims, which were exhausted in *Wingfield* I:

> (6) the trial court violated Mr. Wingfield's due process rights when the court denied his request for a second competency evaluation and failed to comply with statutory safeguards necessary to ensure against the prosecution of an incompetent defendant.
>
> (7) the trial court violated Mr. Wingfield's due process right to a fair trial by allowing him, while incompetent, to represent himself throughout the 7-day trial.
>
> (8) the trial court violated Mr. Wingfield's constitutional right to a fair trial and to present a defense when it refused to grant him access to the discovery during trial.
>
> (9) the trial court violated Mr. Wingfield's due process right to a fair trial when it forced him to defend against evidence admitted improperly pursuant to Colo. R. Evid. 404(b).

(*Id.* at 3-4, 9).

The Court also deemed the § 2254 Application amended to include the following claims, which were exhausted in *Wingfield II*:

> (10) direct appeal counsel was ineffective in failing to argue that Mr. Wingfield was entitled to an ameliorative effect of a subsequent change in the law related to the drug crimes for which he was convicted;
>
> (11) direct appeal counsel was ineffective in failing to challenge the use of an attempted escape conviction as a predicate conviction for habitual offender sentencing; and
>
> (12) direct appeal counsel was ineffective in failing to raise issues Mr. Wingfield wanted to pursue on appeal and in refusing to allow him to assist in the appeal.

(*Id.* at 6-9).

The Court addresses the properly exhausted claims below.

# II. <u>APPLICABLE LEGAL STANDARDS</u>

**A. 28 U.S.C. § 2254**

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The applicant bears the burden of proof under § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

The court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question the court must answer under § 2254(d)(1) is whether the applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time of the relevant state court decision. *See Greene v. Fisher*, 565 U.S. 34 (2011). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision. *Id.* at 412. Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice.* Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

6

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008). If there is no clearly

established federal law, that is the end of the court's inquiry pursuant to § 2254(d)(1).

*See id.* at 1018.

If a clearly established rule of federal law is implicated, the court must determine

whether the state court's decision was contrary to or an unreasonable application of that

clearly established rule of federal law. *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law
> if: (a) the state court applies a rule that contradicts the governing law set
> forth in Supreme Court cases or (b) the state court confronts a set of facts
> that are materially indistinguishable from a decision of the Supreme Court
> and nevertheless arrives at a result different from [that] precedent.
> *Maynard* [*v. Boone*], 468 F.3d [665], 669 [(10th Cir. 2006)] (internal
> quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at
> 405). "The word 'contrary' is commonly understood to mean
> 'diametrically different,' 'opposite in character or nature,' or 'mutually
> opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).

> A state court decision involves an unreasonable application of
> clearly established federal law when it identifies the correct governing
> legal rule from Supreme Court cases, but unreasonably applies it to the
> facts. *Id.* at 407-08. Additionally, we have recognized that an
> unreasonable application may occur if the state court either unreasonably
> extends, or unreasonably refuses to extend, a legal principle from
> Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The court's inquiry pursuant to the "unreasonable application" clause is an

objective inquiry. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may

not issue the writ simply because that court concludes in its independent judgment that

the relevant state-court decision applied clearly established federal law erroneously or

incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A]

7

decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law."

*Maynard*, 468 F.3d at 671.   In addition,

> evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington*, 562 U.S. at 101 (internal quotation marks omitted).   In conducting this analysis, the court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."   *Id.*

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254."   *Maynard*, 468 F.3d at 671; *see also Harrington*, 562 U.S. at 88 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington*, 562 U.S. at 102.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). Section 2254(d)(2) allows the federal court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court. "A state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

Pursuant to § 2254(e)(1), the court presumes that the state court's factual determinations are correct and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller- El v. Cockrell*, 537 U.S. 322, 340 (2003)).

The court applies a *de novo* standard of review to constitutional claims that were not reviewed on the merits by the state courts. *See Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001).

**B.  *Pro Se* Litigant**

Mr. Wingfield is proceeding *pro se*. The court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys."  *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).   A court may not assume that an applicant can prove facts that have not been alleged, or that a respondent has violated laws in ways that an applicant has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).   *Pro se* status does not entitle an applicant to an application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

### III. <u>ANALYSIS</u>

**A.  Claim 1**

For his first claim, Mr. Wingfield contends that the state trial court violated his Sixth and Fourteenth Amendment rights when the court failed to appoint counsel in his post-conviction proceeding and denied his *pro se* state post-conviction motion summarily, given his mental disabilities.   (Doc. # 1 at 4-5).

There is no federal constitutional right to counsel in state post-conviction proceedings.   *See Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987).   Further, a claim

10

of constitutional error that "focuses only on the State's post-conviction remedy and not the judgment which provides the basis for [the applicant's] incarceration . . . states no cognizable federal habeas claim." *Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir. 1998); *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (noting that petitioner's challenge to state "post-conviction procedures on their face and as applied to him would fail to state a federal constitutional claim cognizable in a federal habeas proceeding").

Claim 1 is dismissed because it fails to implicate the federal Constitution.

## B. Claims 2(a)-2(d)

In claim 2, Mr. Wingfield asserts that pre-trial counsel was constitutionally ineffective in: (a) failing to conduct a sufficient investigation and present evidence to support Mr. Wingfield's standing to challenge the search of the motel room; and/or, failing to file a motion to dismiss the charges of possession and conspiracy to manufacture for insufficient evidence (Doc. # 1 at 5-9); (b) failing to discover and present evidence to challenge the admission of prior bad acts evidence (*id.* at 10-13); (c) failing to conduct a sufficient investigation and present evidence to support Mr. Wingfield's incompetence (*id.* at 13-14); and, (d) in waiving Mr. Wingfield's presence at the incompetency hearing.  (*Id.* at 14-17).

In the Order to Dismiss in Part, the Court concluded that sub-claims 2(a)-2(d) had been procedurally defaulted in the state courts, but deferred ruling on whether Mr. Wingfield could meet the cause and prejudice standard to excuse the procedural default because he was not appointed counsel in his initial state post-conviction proceeding.

(Doc. # 24 at 7-9).

In *Martinez v. Ryan*, the Supreme Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17. To excuse the procedural default, Mr. Wingfield must show that the procedurally defaulted ineffective assistance claims are substantial— i.e., have some merit. *Id.* at 16. A claim that is "wholly without factual support" is not substantial. *Id.*

## 1. Supreme Court law

The Sixth Amendment generally requires that defense counsel's assistance to the criminal defendant be effective. *See Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that (1) his counsel's performance was deficient (i.e., that identified acts and omissions were outside the wide range of professionally competent assistance), and (2) he was prejudiced by the deficient performance (i.e., that there is a reasonable probability that but for counsel's unprofessional errors the result would have been different). *Id.*

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). *See also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In other words, there is a rebuttable presumption that "an attorney acted in an objectively reasonable manner and

12

that an attorney's challenged conduct might have been part of a sound trial strategy."
*Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002) (emphasis omitted). "There are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

"With respect to prejudice, . . . '[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 693.

### 2. Analysis

Respondents argue that Mr. Wingfield is precluded from challenging the effectiveness of pre-trial counsel because he made a knowing, intelligent and voluntary waiver of his right to counsel, pursuant to *Faretta v. California*, 422 U.S. 806, 835-36 (1975), and represented himself at trial. (Doc. # 52 at 16). Respondents maintain that once Mr. Wingfield took over his defense, he could have remedied the alleged deficiencies in pre-trial counsel's performance. *See Cook v. Ryan*, 688 F.3d 598, 609 (9th Cir. 2012) ("Even if Cook's pre-trial counsel performed deficiently during the seven months he represented Cook (a contention we reject below), Cook could have corrected those errors once he decided to represent himself. *Faretta* therefore precludes Cook from complaining about the 'quality of his own defense.'").

In *Faretta,* the Supreme Court recognized that "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta*, 422 U.S. at 834 n. 46. Therefore, to the extent the alleged deficiencies by pre-trial counsel were remediable by Mr. Wingfield once he elected to represent himself at the commencement of trial, those deficiencies cannot be deemed prejudicial under *Strickland*, and Mr. Wingfield has failed to show that the claim is substantial under *Martinez* so as to excuse his procedural default.

### a. sub-claim 2(a)

In sub-claim 2(a), Mr. Wingfield claims that pre-trial counsel was constitutionally ineffective in failing to conduct a sufficient investigation and present evidence to support Mr. Wingfield's standing to challenge the search of the motel room; and/or, failing to file a motion to dismiss the charges of possession and conspiracy to manufacture for insufficient evidence. (Doc. # 1 at 5-9).

In support of this claim, Mr. Wingfield alleges that there were "readily available property/evidence inventories," which showed his personal possessions were in the motel room—i.e, a closet full of clothing, a computer with a picture of his daughter taped to the outside of it, a compact disc player, men's hygiene items, and his key to the room. (Doc. # 1 at 7). He states that he had a key to the room and "was staying there." (*Id.*). Mr. Wingfield argues that if [second] pre-trial counsel (Ms. O'Neill) had presented this evidence to the trial court, the court would have ruled to suppress the drug evidence upon which his convictions for possession and conspiracy were based.

14

(*Id.*).   He asserts, in the alternative, that counsel should have moved for dismissal of the charges when the trial court ruled that there was no evidence that Mr. Wingfield ever entered the motel room until immediately prior to the search.   (*Id.* at 8-9).

The state court record reflects that prior to trial, Mr. Wingfield was represented first by Ms. O'Neill, then by Mr. Werking, and again by Ms. O'Neill.   (R., Court File at 386-87, 542, 637).   Before trial, Mr. Werking filed a motion to suppress the evidence seized from a Super 8 motel room on May 22, 2007 on the ground that neither Mr. Wingfield, nor third parties, voluntarily consented to the officers' entry of the motel room. (R., Court File at 537).   The trial court held an evidentiary hearing on November 6, 2008.   With regard to the issue of consent, City of Aurora police investigator Poppe testified that he and Officer Novak knocked on the motel room door and a woman answered.   (R., 11/6/08 Hrg. Tr., Christopher Poppe testimony, at 104).   The woman identified herself as Jeannine Evans, the registrant of the motel room.   (*Id.*). Investigator Poppe informed Ms. Evans that he was a police officer and asked if he could enter the room to speak to her.   (*Id.*).   Investigator Poppe testified that he and Officer Novak did not have their guns drawn, did not threaten Ms. Evans, and did not promise her anything if she agreed to let them in.   (*Id.* at 104-05).   Ms. Evans opened the door and allowed the officers to enter.   (*Id.* at 106).   Investigator Poppe then asked Ms. Evans whether anyone was in the room other than Ms. Evans and another female (Nicole Power).   (*Id.* at 107).   Ms. Evans responded in the negative and allowed the officers to perform a safety check to make sure no one else was present who could pose a danger to the officers.   (*Id.* at 107).   Mr. Wingfield remained silent in the

bathroom during this exchange.   (*Id.* at 108-09; *see also* Testimony of Officer Matthew

Novak, at 72).   On cross exam, investigator Poppe testified that he did not recall

whether any of Mr. Wingfield's personal belongings were in the room.   (*Id.* at 116).

Investigator Poppe further testified that Ms. Evans was interviewed several minutes

after they entered the motel room.   (*Id.* at 119-20).   Mr. Werking commented that he

"wanted to know about that taped interview" to determine whether there were any

"threats, promises and coercion" by either investigator Poppe or Officer Novak that

compelled Ms. Evans to allow the officers to enter the motel room.   (*Id.* 119).

However, based on investigator Poppe's testimony, Mr. Werking subsequently withdrew

his motion to suppress the search of the motel room for lack of standing.   (*Id.* at 120).

Ms. O'Neill was appointed to represent Mr. Wingfield in July 2009.   (R., Court

File at 637).   Ms. O'Neill disagreed with Mr. Werking's decision to withdraw the motion

to suppress and filed a second motion to suppress in November 2009.   (R., Court File

at 663).   The trial court set an evidentiary hearing for November 27, 2009, which was

continued so that Ms. O'Neill could locate the defense witness, Jeannine Evans.   (R.,

11/13/09 Hrg. Tr. at 19, 28-32; 11/23/09 Hrg. Tr.).   At the December 11, 2009 hearing,

Ms. O'Neill told the Court that Ms. Evans had been served the night before, had failed to

appear for the hearing, and that Ms. Evans was under subpoena for trial.   (R., 12/11/09

Hrg. Tr. at 18-19).   Ms. O'Neill argued to the court that Mr. Wingfield had standing to

contest the entry and search of the motel room based on his privacy interest in the

room, vis-à-vis his intention to stay in the room with Ms. Evans as her overnight guest

for an extended period of time.   (R., 12/11/09 Hrg. Tr. at 20-21).   The prosecution

responded that, regardless of the standing issue, Mr. Wingfield consented to the search

as a matter of law because he was hiding in the bathroom and failed to object when Ms.

Evans, the motel registrant, gave her consent for the police to enter the motel room.

(*Id.* at 21-22).   The trial court then made the following ruling:

> Now the proffer I have in front of me is that Mr. Wingfield had an intention to remain in that room with Ms. Evans and I guess this other lady.
> . . .
> And from that the argument is that he had a right to deny consent that Ms. Evans had given.
>
> But I have to note the rest of the evidence is that he was as [the officer] testified, he was discovered in the bathroom after according to [the officer] they gained consent to enter the room. And so the inference that I take from that is that Mr. Wingfield knew that the police were knocking on the door and he hid in the bathroom and from that inference I find that they didn't have to obtain his consent. That they had consent of the legal registrant of the room and they entered the room.
>
> By the way, I should note from [the officer's] testimony and I think I found when I did this originally, they asked the lady, Ms. Evans, can we see, is there anyone else here in the room. The other lady was right there when they opened the door and he accepted [consent and asked] is there anyone else and she said no. And they said can we look for safety purposes and she said yes. And they opened the door and they found Mr. Wingfield.
>
> So those from the proffer and the facts that I know my inference is he knew the police were at the door and he chose to go in the bathroom and they didn't have to obtain his consent under those circumstances.

(R., 12/11/09 Hrg. Tr. at 23-24).   The court further found that Ms. Evans' consent for

the officers to enter the motel room was voluntary, based on investigator Poppe's

testimony at the November 6, 2008 suppression hearing.   (*Id.* at 28-29).   However, the

court informed defense counsel that Mr. Wingfield would be allowed the opportunity to

challenge the voluntariness of Ms. Evans' consent if Ms. Evans honored her trial subpoena and appeared to testify before the prosecution put on evidence about the consensual entry and search of the motel room. (*Id.* at 28-29). Trial commenced the following Monday. Ms. Evans did not appear and Mr. Wingfield, who elected to proceed *pro se* on the first day of trial (*see* R., 12/14/090 Trial Tr. at 38)*,* did not raise the issue of Ms. Evans' testimony again.

The state record reflects that Ms. O'Neill's performance in litigating the suppression issue was not objectively unreasonable. Ms. O'Neill persuaded the trial court to hold a second suppression hearing on December 11, 2009, but Ms. Evans, the defense witness, failed to appear. Ms. O'Neill also placed Ms. Evans under subpoena for the trial starting on December 14, 2009, but Ms. Evans did not appear at trial. Moreover, the state court record reflects that Mr. Wingfield, who represented himself throughout the trial proceeding, did not make any further effort to have Ms. Evans appear in court to testify about the voluntariness of her consent to allow the police officers to enter the motel room. With regard to Mr. Wingfield's contention that it was necessary for the police to obtain his consent, as well as the consent of Ms. Evans, the trial court's determination to the contrary comported with federal law. *See Georgia v. Randolph*, 547 U.S. 103, 121 (2006) ("If a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.").

Mr. Wingfield contends in his Reply that pre-trial counsel was ineffective in failing to obtain from the prosecution a recorded police interview of Ms. Evans following the search of the motel room. (Doc. # 63 at 5). However, the state court record does not establish that the police interview of Ms. Evans was recorded. Officer Novak testified that he interviewed Nicole Power, Mr. Wingfield's then-girlfriend who was also present in the motel room with him and Ms. Evans at the time of the search, several minutes after the police entry, but Officer Novak did not record that interview because "he did not have a recording device with him that night." (R., 12/17/09 Trial Tr. at 64-65, 68; Nicole Power Testimony, *id.* at 44-46). Moreover, even if there was a recorded interview, once Mr. Wingfield elected to proceed *pro se*, he did not apprise the trial court that a tape-recorded police interview of Ms. Evans existed and had not been disclosed to him in discovery.

The Court finds that Mr. Wingfield's ineffective assistance allegations in sub-claim 2(a) lack merit and, therefore, his procedural default is not excused under *Martinez v. Ryan*. Alternatively, sub-claim 2(a) is subject to dismissal on the merits.

With regard to Mr. Wingfield's alternate contention, that Ms. O'Neill should have filed a motion to dismiss the drug possession charges based on insufficient evidence that he possessed the items found in the motel room, Mr. Wingfield fails to show that he was prejudiced by the alleged deficient performance. In denying Mr. Wingfield's motion for judgment of acquittal at the close of the prosecution's evidence at trial, the district court ruled:

The legal definition of possession is, aware of his physical possession or control thereof for a sufficient time to have been able to have terminated it.

Given the amount of time that you were in the Room 131 and given the similar acts, which means that there is some evidence that you have knowledge with regard to what these chemicals are used for, motion for judgment of acquittal on Count 1 is denied.

Motion for judgment of acquittal on [Count 2] possession of the chemicals.   It's my same theory there.

(R., 12/22/09 Trial Tr. at 76-77).   Accordingly, the Court further finds that Mr.

Wingfield's alternative ground for relief in sub-claim 2(a) also lacks merit and, therefore,

he cannot rely on *Martinez v. Ryan* to excuse his procedural default.

Sub-claim 2(a) is dismissed in its entirety as procedurally barred, or, alternatively,

on the merits.

### b. sub-claim 2(c)

Mr. Wingfield asserts in sub-claim 2(c) that pre-trial counsel was ineffective in

failing to conduct a sufficient investigation and present evidence to support Mr.

Wingfield's incompetence.   (Doc. # 1 at 13-14).

"It is well established that the Due Process Clause of the Fourteenth Amendment

prohibits the criminal prosecution of a defendant who is not competent to stand trial."

*Medina v. California*, 505 U.S. 437, 439 (1992) (citing *Drope v. Missouri*, 420 U.S. 162

(1975); *Pate v. Robinson*, 383 U.S. 375 (1966)).   A defendant is competent to stand

trial when he "has sufficient present ability to consult with his lawyer with a reasonable

degree of rational understanding" and he possesses "a rational as well as factual

understanding of the proceedings against him."   *Dusky v. United States*, 362 U.S. 402

(1960).  *See also Drope*, 420 U.S. at 171-72.

### i. pre-trial counsel O'Neill's first representation

The state court record reflects that, at a hearing held on July 16, 2007, while Mr.

Wingfield was represented by Ms. O'Neill, the prosecution raised an issue about

Applicant's competency premised on a preliminary evaluation performed by Dr. Sather

at the Arapahoe County Detention Facility on July 2, 2007.   (R., 7/16/07 Hrg. Tr. at 2-3,

5, 8-9).   Dr. Sather recommended that Mr. Wingfield receive an immediate psychiatric

evaluation based on his opinion that Applicant's behavior at the jail constituted a danger

to himself and others.   (R., Court File at 938).   The trial court ordered that Mr.

Wingfield be committed to the Colorado Mental Health Institute at Pueblo (CMHIP) for a

competency evaluation.   (R., 7/16/07 Hrg. Tr. at 10-12; *see also* Court File at 401-04).

A CMHIP psychiatrist, Dr. Rose Manguso, evaluated Mr. Wingfield and issued a

written opinion on September 20, 2007 finding that he was competent to proceed to

trial.  (*See* R., 10/11/07 Hrg Tr. at 6; Sealed Documents, 9/20/07 Report from Dr.

Manguso, at 11-23).   Specifically, Dr. Manguso opined that Mr. Wingfield "is not

currently suffering from a mental disease or defect which renders him incapable of

understanding the nature and course of the proceedings against him, or of participating

in his defense, or cooperating with defense counsel."   (R., Sealed Documents, at 23).

Dr. Manguso further stated that she shared the opinions of other CMHIP forensic

psychiatric staff members that "Mr. Wingfield's maladaptive behaviors are under his

volitional control and he has no acute clinical condition limiting his ability to control his

behavior and outbursts" and that "Mr. Wingfield is capable of controlling himself and

21

exhibiting calm and rational behavior when he chooses to do so." (*Id.* at 22-23).

Upon receipt of Dr. Manguso's report, the trial court held a competency review in October 2007, and determined that Mr. Wingfield was competent to proceed to trial. (R., 10/11/07 Hrg. Tr.). Mr. Wingfield was not present at the competency review because he had been transferred from CMHIP on a writ to the Pueblo County Jail for proceedings involving an assault charge. (*Id.*). Pre-trial counsel, Ms. O'Neill, waived Mr. Wingfield's appearance and did not contest the finding of competency. (*Id.*).

Mr. Wingfield contends that Ms. O'Neill should have rebutted the trial court's finding of competency with records from CMHIP which would have shown that he was certified by a Pueblo County Judge to be a danger to himself or others and ordered to take anti-psychotic medication for seven days and that he assaulted a CMHIP staff member during a cell extraction. (Doc. # 1 at 13). Mr. Wingfield argues that the records from CMHIP "proved [his] bizarre, aggressive, and violent behavior while at the State hospital and contradicted the findings of the competency report the trial court relied on in determining [him] competent to proceed." (*Id.* at 14). However, Dr. Manguso detailed some of Mr. Wingfield's behavior management problems while at CHMIP in her report (R., Sealed Exhibits at 14-19), but she nonetheless concluded that his behavior was within his control and that he was competent to proceed to trial.

### ii. pre-trial counsel Werking's representation

In November 2007, Mr. Wingfield waived his right to counsel and elected to proceed *pro se.* (R. 11/15/07 Hrg. Tr. at 9). On March 12, 2008, Mr. Wingfield indicated to the court that he wished to challenge Dr. Manguso's October 2007 opinion

of competency with his mental health records from CMHIP, the Colorado Department of Corrections, Denver County, and Pueblo County. (R., 4/12/08 Hrg. Tr. at 14-16). Mr. Wingfield asked the trial court to order a private evaluation of his competency. (*Id.* at 16-17). Advisory counsel Werking informed the court that Mr. Wingfield had been seen by a psychiatrist at the Arapahoe County Detention Facility, Dr. Sather, who concluded that Applicant has an organic defect and prescribed anti-psychotic medication, which Applicant was taking on an intermittent basis. (*Id.* at 30-31, 33, 34). Mr. Werking asked the court to order a mental health evaluation. (*Id.* at 31). Mr. Wingfield stated that he wanted the evaluation performed by someone who was "not part of the whole conspiracy against him." (*Id.* at 32). The court asked Mr. Werking to provide information from Dr. Sather for the court's consideration. (*Id.* at 35).

At a subsequent hearing on April 10, 2008, Mr. Werking informed the court that he had Mr. Wingfield's mental health records from the Arapahoe County Detention Facility and would discuss the issue of a second competency evaluation with Applicant before the next hearing. (4/10/08 Hr. Tr.). Mr. Werking informed the court that Mr. Wingfield was "going downhill in his behavior and his mental health." (*Id.* at 6).

The court again addressed Mr. Wingfield's mental health on April 23, 2008. Mr. Wingfield told the court that he had been prescribed various medications for his mental health issues, that he did not take some of them because they "fog[] up his perception," (*id.* at 6) and that he did not think he was "crazy." (*Id.* at 9). Advisory counsel Werking informed the court that a psychologist at the Arapahoe County Detention Facility continued to recommend a mental health evaluation for Mr. Wingfield because he was

suffering from suicidal ideation and homicidal ideation.   (*Id.* at 10).   Mr. Werking further

stated:

> This is a person or a gentleman who is extremely intelligent,
> extremely articulate but at the same time, and again, I'm not an expert, at
> the same time he is a person who is in dire need of some type of
> psychological assistance. I know that he is not in voluntary compliance
> with any medicine that has been prescribed. He'll take some at certain
> points.   Seroquel, which is the anti-psychotic which will cut down on some
> of the delusional behavior is one that he has not been compliant with.
> Lithium which is a mood stabilizer, he has been diagnosed as extremely
> bipolar.   Lithium, which is a mood stabilizer, he will not take and does not
> tolerate. Lamictal, another mood stabilizer, he has refused to take.
> Wellbutrin, another mood stabilizer and antidepressant, he seems to take
> that, at least that drug, but the rest he's either completely noncompliant
> with or compliant at times and with the Seroquel he feels that it makes him
> groggy and that he doesn't think right and that when he perceives what we
> might see as reality, no offense, it causes him anxiety and depression. If in
> fact I was the attorney in this case rather than simply an advisor I would
> be moving for at least a private psychiatric evaluation. I've read the
> statutes and defense counsel can make that motion, but as advisory
> counsel I feel I'm almost powerless in making that motion and I don't know
> thus far with Mr. Wingfield, I don't think he agrees with my assessment of
> his mental health.

(R., 4/23/08 Hrg. Tr. at 11-12).   Mr. Wingfield then told the court that he did not agree

with Mr. Werking's statements, but he did request a competency evaluation.   (*Id.* at 12,

13, 19).   The court expressed concern about Mr. Wingfield's competence to proceed

when he was not taking prescribed medications and invited him to make a record on

that issue.   (*Id.* at 16).   Mr. Wingfield informed the court that he felt he was competent

to proceed and that he did not take all of the prescribed medications because he did not

like the way they made him feel.   (*Id.* at 17-18).   The court determined that because

Mr. Wingfield was able to properly articulate responses to the issues presented to the

court, and based on Dr. Manguso's finding of competency, he was competent to

proceed. (*Id.* at 19). Mr. Wingfield agreed that he was competent to proceed with the motions hearing set for that day. (*Id.* at 25, 28).

Mr. Wingfield renewed his request for an independent mental health evaluation on July 25, 2008, while he was still *pro se*, because of his ongoing belief that everyone was conspiring against him. (R., 7/25/08 Hrg. Tr. at 17-18). Mr. Wingfield told the court that he suffered from paranoia and impulse control problems. (*Id.*). The trial court denied the request based on the court's previous determinations that Mr. Wingfield was competent to proceed. (*Id.* at 19).

In June 2009, Mr. Werking, who had been appointed to represent Mr. Wingfield, filed a Motion for Competency Evaluation and Hearing, in which he stated that Mr. Wingfield's "mental capacity is severely impaired" and that "[t]his impairment has increased significantly in the past couple of months and has progressed to the point that Mr. Wingfield has become unwilling to work with defense counsel." (R., Court File, at 591). Mr. Werking further stated in the motion that Mr. Wingfield "believes undersigned counsel, the prosecutor and this Court conspired to ensure the Defendant is convicted of the allegations." (*Id.* at 591-92). Mr. Werking also represented that Mr. Wingfield was seen by Dr. Mozer, a psychiatrist at the Arapahoe County Jail, the week prior to a scheduled jury trial on April 27, 2009 in a separate criminal proceeding. (*Id.* at 592). Although Dr. Mozer described Mr. Wingfield as having "severe mental health issues" and expressed his opinion that he was uncertain whether Mr. Wingfield was competent to proceed to trial, the trial court in the other action found Mr. Wingfield competent. (*Id.*). Mr. Werking stated that the anti-psychotic medication that Dr. Mozer had

prescribed for Mr. Wingfield caused him to be confused about the trial issues and unable to communicate meaningfully with counsel. (*Id.*).

At a June 24, 2009 hearing on the motion for a second competency evaluation, defense counsel told the court that, as stated in his motion, Mr. Wingfield had a serious mental disease or defect and it was unclear whether he was able to aid in his defense. (R., 6/24/09 Hrg. Tr. at 3-4). Counsel asked the court to order a competency evaluation performed by Dr. Mozer at the jail. (*Id.* at 4). Counsel informed the court that since Dr. Manguso issued her report in September 2007, Mr. Wingfield had been diagnosed with bipolar disorder and paranoid schizophrenia, for which he had been prescribed anti-psychotic and psychotropic medications that he was taking intermittently. (*Id.* at 11-21). The court determined that the information before it was inadequate to determine whether a second competency evaluation was warranted and ordered that Mr. Wingfield be evaluated by Dr. Mozer as to the need for a second competency evaluation. (*Id.* at 46-50). The court stated that it would allow the defense to challenge Dr. Manguso's finding of competency with an opinion from Dr. Mozer. (*Id.* at 50). At a hearing held on June 30, 2009, Mr. Werking informed the court that in the past few days, "the issue as to competency was resolved" and that he withdrew his motion for a competency evaluation. (R., 6/30/09 Hrg. Tr. at 3). Dr. Mozer told Mr. Werking that if he evaluated Mr. Wingfield, "he would find [him] competent." (*Id.* at 5).

### iii. pre-trial counsel O'Neill's second representation

The state court record reflects that after Ms. O'Neill was appointed to represent Mr. Wingfield the second time, she raised the issue of his competence to proceed in December 2009, at the commencement of trial. (R., 12/14/09 Hrg. Tr. at 2). Ms. O'Neill informed the court that Mr. Wingfield had slashed himself with a razor at the jail earlier that morning and was on suicide watch. (*Id.* at 3). Ms. O'Neill asked the court to order a mental health evaluation. (*Id.* at 5). The court then heard telephone testimony from Mr. Wingfield's mental health coordinators at the jail, Dr. Sather and Ms. Sivak. Dr. Sather testified that he could not perform a competency evaluation on Mr. Wingfield before trial commenced the following day, but mental health providers at the jail would assess his status each morning before trial to determine whether he could participate safely in the courtroom proceedings. (*Id.* at 21-22). Dr. Sather and Ms. Sivak further testified that Mr. Wingfield was oriented as to time and place and understood the substance of their conversations with him. (*Id.* at 24). In response to Ms. O'Neill's questions, Dr. Sather stated that he could not render an opinion on legal competency without evaluating Mr. Wingfield for that purpose. (*Id.* at 28). Ms. O'Neill again asked the court to refer Mr. Wingfield for a competency evaluation because of his attempted suicide. (*Id.* at 34). The trial court denied counsel's request for a competency evaluation based on the following: Dr. Manguso's September 2007 finding of competency; Dr. Mozer's June 2009 statements to former defense counsel Werking that caused Mr. Werking to withdraw his request for a second competency evaluation; Mr. Wingfield's successful participation in two separate trials, his engagement in the

pre-trial motions filed in the present case, and his sophisticated knowledge of the Rule 404(b) issue; and, the opinions of Dr. Sather and Ms. Sivak that Mr. Wingfield could safely participate in the trial. (*Id.* at 36-37).

The following day, Ms. O'Neill again raised her concern about Mr. Wingfield's competency and requested a second competency evaluation, given that Applicant had been diagnosed as bipolar and schizophrenic since Dr. Manguso's determination of Mr. Wingfield's competency in September 2007. (R., 12/15/09 Trial Tr. at 5-6). The trial judge reaffirmed his ruling from the previous day that the court did not have a bona fide doubt about Applicant's competency based on his own observations of how Mr. Wingfield had conducted himself in the courtroom during pre-trial proceedings after Dr. Manguso rendered her competency opinion. (*Id.* at 8-11). In response to Ms. O'Neill's statement that Mr. Wingfield was delusional, the trial judge stated that he "gives great credence to Dr. Manguso's opinion that [Mr. Wingfield] engages in maladaptive behavior deliberately" and did not order a second competency evaluation. (*Id.* at 13).

The Court finds that Mr. Wingfield has failed to demonstrate that his pre-trial counsels' performance in addressing the issue of his competency fell below an objective standard of reasonableness or that he was prejudiced as a result. Both pre-trial attorneys raised the issue of Applicant's competency, but the trial court ruled that no further competency evaluation was warranted. Further, Mr. Wingfield does not point to any mental health provider who would have opined that he was incompetent. *See e.g. Huricks v. Thaler*, No. 08–51050, 417 F. App'x. 423, 428 (5th Cir. March 11, 2011) (unpublished) (concluding that habeas petitioner did not establish prejudice resulting

from counsel's alleged failure to investigate his competency where petitioner failed to rebut state courts' factual findings that he was able to consult with his lawyer with a reasonable degree of rational understanding, and that petitioner had a rational and factual understanding of the proceedings based on petitioner's participation in court proceedings).

Mr. Wingfield's assertion in his Reply brief that pre-trial counsel should have retained an expert who would have opined that he "was suffering from an organic defect that caused [him] to be paranoid and irrational" (Doc. # 63 at 7) fails to satisfy the *Strickland* standard absent a showing that an expert would have opined that he was incompetent. *See*, *e.g., Duran v. Attorney General of New Mexico*, No. 13-2072, 565 F. App'x 719, 723 (10th Cir. May 2, 2014) (unpublished) (rejecting habeas petitioner's claim that defense counsel failed to properly investigate a mental health defense where petitioner failed to demonstrate that further investigation would have yielded an expert willing to testify that petitioner was insane or unable to for the requisite *mens rea* for the crime).

The Court finds that sub-claim 2(c) is not a substantial claim under *Martinez v. Ryan* and, therefore, the claim is dismissed as procedurally defaulted. Alternatively, the claim is subject to dismissal on the merits.

### c. sub-claims 2(b) and 2(d)

Respondents argue that sub-claims 2(b) and 2(d) lack substantial merit under *Martinez v. Ryan* because the underlying premises of the sub-claims were resolved against Mr. Wingfield on direct appeal. (Doc. # 52 at 19).

29

The basis for sub-claims 2(b) and 2(d) are also asserted as claims of trial court error in claims 4 and 9. Therefore, in the interest of judicial efficiency, the Court will address the ineffective assistance claims in conjunction with the claims of trial court error in Sections III.D and H, *infra.*

## C. Claim 3

Mr. Wingfield maintains in claim three that the trial court violated his Fifth, Sixth and Fourteenth Amendments rights by failing to give him an adequate advisement on his right to testify. (Doc. # 1 at 9-10). Mr. Wingfield also asserts that he was compelled to waive his Fifth Amendment privilege and testify in his own defense because the trial court failed to inform him that the jurors would be instructed that they could not infer his guilt if he exercised his right to remain silent. (*Id.* at 10).

### 1. State court proceeding

The Colorado Court of Appeals rejected Mr. Wingfield's claim on the following grounds:

> Even if we assume that this claim is properly before this court on appeal, we conclude that it is directly refuted by the record. During the trial, the trial court gave Wingfield the *Curtis*[3] advisement twice. The court specifically informed him that the jury could not consider his prior convictions as substantive evidence of guilt in this case, and that those convictions could only be used by the jury to evaluate his credibility if he chose to testify. The court also instructed Wingfield that the jury would not be able to infer anything "bad" from the fact that he chose not to testify. In response, Wingfield repeatedly expressed his desire to testify and made other statements that the court found showed that he understood and was knowingly and voluntarily exercising his right to testify.

---

3 *People v. Curtis*, 681 P.2d 504 (Colo. 1984) (setting forth the advisement the trial court must give a criminal defendant prior to his waiver of right to testify).

Thus, although Wingfield now claims the advisement on the consequences of testifying was incomplete, the record shows that the court gave him an adequate *Curtis* advisement and engaged him in a discussion about the consequences of testifying. To the extent Wingfield argues on appeal that he felt compelled to testify, he did not assert that in the district court. And the record supports the court's finding that Wingfield made a knowing and voluntary decision to testify after receiving a *Curtis* advisement. *See, e.g., People v. Bradley,* 25 P.3d 1271, 1276 (Colo. App. 2001) (rejecting similar issue arising after a valid *Curtis* advisement, but in an ineffective assistance of counsel context). Accordingly, the court did not err in rejecting his claim without a hearing.

(*Wingfield II*, Doc. # 10-9 at 6-7).

## 2. Supreme Court law

The Fifth Amendment guarantees an accused the right to remain silent during his criminal trial and prevents the prosecution for commenting on the silence of a defendant who asserts the right. *Griffin v. California*, 380 U.S. 609, 614 (1965). A defendant in a criminal case also has a fundamental right to testify in his own defense, *see Rock v. Arkansas*, 483 U.S. 44, 51 (1987), but may not be compelled to do so. The Supreme Court has recognized that

[t]he defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction . . . That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.

*Williams v. Florida*, 399 U.S. 78, 83-84 (1970). *See also Harrison v. United States,* 392 U.S. 219, 222 (1968) (observing that "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination . . . , [even though] the defendant may

have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.").

The Supreme Court has never held that a criminal defendant must be given any advisement before he makes the decision to testify or not testify. *See Turley v. Estep*, No. 09-1215, 375 F. App'x 867, 870 (10th Cir. April 12, 2010) (unpublished) ("there is no general requirement under federal law that a trial court inquire into a defendant's decision whether to testify, much less advise a defendant regarding the potential consequences of that decision"); *United States v. Williams*, No. 04-6121, 139 F. App'x 974, 976 (10th Cir. July 18, 2005) (unpublished) (stating that a trial court has no duty to explain to the defendant that he has a right to testify or to verify that a defendant who is not testifying has waived the right) (citing *United States v. Ortiz*, 82 F.3d 1066, 1069-70 & 1069 n. 8 (D.C.Cir.1996) (collecting cases).

### 3. AEDPA analysis

To the extent Mr. Wingfield alleges a violation of the Colorado Supreme Court's decision in *Curtis*, the claim is not cognizable in this action because relief under § 2254 is not available for violations of state law. *See Richmond v. Embry*, 122 F.3d 866, 870 (10th Cir. 1997). Instead, a federal habeas court is limited to deciding whether there has been a violation of "the constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Because the Supreme Court has never held that a trial court is required to provide a criminal defendant with any advisement concerning his right to testify, Mr. Wingfield cannot show that the Colorado Court of Appeals' decision was contrary to or

an unreasonable application of Supreme Court law. Further, the state appellate court's factual findings in support of its determination that Mr. Wingfield's decision to testify was knowing and voluntary are supported by the state court record and thus cannot be characterized as unreasonable under § 2254(d)(2). The trial court advised Mr. Wingfield that he had the right to remain silent and that if he chose to exercise that right, the jury would be instructed "that they can't take any bad meaning from that because . . . it's a constitutional right." (R. 12/21/09 Trial Tr. at 253-254; 12/22/09 Trial Tr. at 180-85). The trial court further informed Applicant that if he chose to testify, he would waive his privilege against self-incrimination and the prosecution could cross-examine him about his prior felony convictions. (R., 12/21/09 Trial Tr. at 248-252; 12/22/09 Trial Tr. at 34-35). Mr. Wingfield told the court that he made the decision to testify knowingly and voluntarily (R., 12/22/09 Trial Tr. at 182-83), and the state court record reflects that Applicant made a strategic decision to testify because he wanted to dispute the prosecution's evidence against him.

Mr. Wingfield's third claim will be dismissed.

**D. Claim 4**

In claim four, Mr. Wingfield argues that the trial court violated his Sixth and Fourteenth Amendment rights by allowing pre-trial counsel to waive his presence at the competency hearing. (Doc. # 1 at 14-15). In sub-claim 2(d), Mr. Wingfield asserts that pre-trial counsel was ineffective in waiving Mr. Wingfield's presence at the incompetency hearing. (*Id.* at 14-17).

### 1. State court proceeding

In *Wingfield I*, the Colorado Court of Appeals denied relief on the claim of trial court error because the claim was resolved against Mr. Wingfield in a separate action involving his attempted escape from jail.   In *People v. Wingfield*, 411 P.3d 869 (Colo. App. 2014), the Colorado Court of Appeals concluded that Mr. Wingfield's constitutional rights were not violated by pre-trial counsel's waiver of his presence at the competency hearing because Mr. Wingfield failed to show how his presence would have been useful to his defense.   *See id.* at 872-874 (citing *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)).

In Mr. Wingfield's direct appeal in the present action, the Colorado Court of Appeals relied on the panel's ruling in the 2014 decision to deny Applicant relief because the trial court decided his competency to stand trial for both cases during the same hearing.   (*Wingfield I*, Doc. # 10-5 at 7).

### 2. Supreme Court law

The Supreme Court "has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."   *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (internal quotation marks omitted).   "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the

procedure." *Id.* However, "[t]he privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" *Id.*

### 3. AEDPA analysis

In the § 2254 Application, Mr. Wingfield argues that had he been present at the October 2007 competency review, he would have provided evidence of his behavioral records at CMHIP, his own testimony, and his mental health records from the jail to refute the CMHIP psychiatrist's report finding him competent to proceed**.** (Doc. # 1 at 14-16; *see also* Doc. # 63 at 8). However, during the pendency of pre-trial proceedings, the trial court did consider the record of Mr. Wingfield's behavior at CMHIP (as detailed in Dr. Manguso's report); Applicant's statements to the court concerning his competence; his mental health records from the jail; statements made by Dr. Mozer to pre-trial counsel in June 2009 that caused counsel to withdraw his request for a second competency evaluation; and, the December 2009 telephone testimony of Mr. Wingfield's mental health providers at the Arapahoe County Detention Facility. (*See* 4/23/08 Hrg Tr.; 6/24/09 Hrg. Tr.; 6/30/09 Hrg. Tr. at 3-5; 12/14/09 Hrg Tr. at 21-28). None of the information altered the trial court's original determination that Mr. Wingfield was competent to proceed to trial. Mr. Wingfield does not point to any evidence that, had it been considered by the trial court, would have undermined Dr. Manguso's report finding him competent to proceed. In other words, Mr. Wingfield fails to show that his presence at the competency hearing would have been useful to the defense in conjunction with the trial court's finding of competency. As such, the Court finds that the Colorado Court of Appeals' decision was not contrary to, or an unreasonable

application of *Stincer*. Further, Mr. Wingfield fails to demonstrate that the state appellate court's adjudication of his claim was based on an unreasonable factual determination.

Mr. Wingfield's fourth claim will be dismissed.

**4. Ineffective assistance claim**

With regard to the related ineffective assistance of counsel allegations in sub-claim 2(d), the Court finds that even if pre-trial counsel's waiver of Mr. Wingfield's presence at the competency hearing constituted deficient performance, Mr. Wingfield has failed to demonstrate that he was prejudiced as a result. Mr. Wingfield does not point to any evidence that pre-trial counsel failed to bring to the trial court's attention that had a reasonable probability of changing the trial court's initial finding of competency. Mr. Wingfield asked the trial court for a second competency evaluation in March 2008, relying on his mental health records at various facilities, and his own statements concerning his mental health problems, but the trial court deemed the records and his statements insufficient, in the absence of an expert opinion of incompetence. Mr. Wingfield later requested and was granted the opportunity to rebut the October 2007 competency finding with an evaluation by Dr. Moser, his treating psychiatrist at the Arapahoe County Detention Facility, but Dr. Moser did not render an opinion that Mr. Wingfield was incompetent.

The Court finds that sub-claim 2(d) lacks substantial merit under *Martinez v. Ryan*, and, therefore, the claim will be dismissed as procedurally barred. Alternatively, sub-claim 2(d) is subject to dismissal on the merits.

**E. Claim Six**

For his sixth claim, Mr. Wingfield asserts that the trial court violated his due process rights when the court denied his repeated requests for a second competency evaluation and failed to comply with statutory safeguards necessary to ensure against the prosecution of an incompetent defendant. (*See* Opening Brief in *Wingfield I,* Doc. # 10-2 at 35). Mr. Wingfield argued on direct appeal that the following evidence created a bona fide doubt about his competency:

> (1) Wingfield suffered from suicidal ideation (2) Wingfield suffered from an organic mental defect (3) Wingfield had received prescriptions for various psychotropic drugs, but had failed to comply with the prescriptions (4) Wingfield suffered from debilitating paranoia (5) Wingfield suffered from psychotic delusions (6) Wingfield had received various mental health diagnoses (7) Wingfield lacked the ability to work with defense counsel due to his mental illnesses (8) Wingfield presented a threat to himself and others (9) Dr. Mozer had recommended further testing of Wingfield's competency due to his mental illnesses (10) Wingfield attempted suicide by overdosing on psychotropic pills and cutting his wrist with a razor blade and (11) Wingfield heard voices.

(*Id.* at 38-39).

**1. State court proceeding**

Mr. Wingfield first raised his procedural competency claim in a separate criminal case charging him with assault on a staff member at CMHIP. In *Wingfield*, 411 P.3d 869, the Colorado Court of Appeals reviewed the claim for harmless error and resolved it on the following grounds:

> Wingfield requested a second competency examination on five occasions throughout trial. On three occasions, April 23, 2008, and April 27 and 29, 2009, the court took Wingfield's request under advisement and issued rulings finding Wingfield competent to proceed, denying his request for a second competency examination.

37

For example, on the third day of trial, Wingfield requested a second competency examination based on Dr. Mozer's telephone testimony stating that Wingfield was suffering from paranoid delusions that were interfering with his medical treatment and his ability to assist in his defense. The trial court denied the motion, stating that based on both its observations of Wingfield at trial and conversations it had had with him, Wingfield could understand the proceedings and his predicament. In so doing, the trial court implicitly made a preliminary finding of Wingfield's competency.

Wingfield relies on his general behavior throughout trial and his history of mental illness to argue that the trial court abused its discretion in denying his requests for a second examination. However, that Wingfield was being treated for mental health issues, rambled and made inappropriate comments, and became upset and expressed paranoid thoughts after the court denied his motions, does not demonstrate that he was incapable of understanding the proceedings and assisting counsel. *See Jermyn v. Horn*, 266 F.3d 257, 293 (3d Cir. 2001) (The defendant's "psychiatric history [and] history of strange behavior . . . do not necessarily suggest that, because of his mental illness, [the defendant] was incapable of understanding the proceedings and assisting in his defense."); *Bloom [v.* People], 185 P.3d [797,] 810 [(Colo. 2008)] (defendant competent despite her "near hysterical" behavior at first court appearance).

Finally, although at various times Wingfield referenced the opinions of psychiatrists who questioned his mental state, he never obtained an affidavit from any of these psychiatrists and never made an offer of proof of his incompetence to proceed.

Even if we assume that the trial court abused its discretion in denying Wingfield a second competency examination, we conclude that any error was harmless beyond a reasonable doubt. Wingfield's first competency examination found him competent. Further, the trial court had ample opportunity to observe Wingfield's actions and general demeanor throughout trial. It heard testimony from Dr. Mozer indicating that Wingfield could conceivably control his paranoia and assist with his defense by taking his medication. Finally, Wingfield never made an offer of proof about what evidence to establish his incompetence could be presented, as required by *Dusky [v. United States,* 362 U.S. 402, 403 (1960)] . . . , at either a competency hearing or during a second competency examination.

Therefore, we conclude that the trial court did not abuse its discretion in denying Wingfield's request for a second competency

examination. We similarly conclude that the trial court did not violate Wingfield's right to due process by allowing him to be tried despite his alleged incompetence, and we further conclude that, even if the court abused its discretion, any error was harmless beyond a reasonable doubt.

*Id*. at 977-78.

On direct appeal in the present action, the Colorado Court of Appeals, reviewing for plain error, resolved the claim on the following grounds:

Due process prohibits the trial of an incompetent defendant. *Dusky v. United States,* 362 U.S. 402, 403 (1960). . . . A defendant is incompetent when suffering from a mental disease or defect which renders him or her incapably of understanding the nature and course of the proceedings, participating or assisting in the defense, or cooperating with defense counsel. [*Dusky*, 362 U.S. at 402]. If a "sufficient doubt" of competency has been raised, a trial court's failure to make a competency determination violates a defendant's right to due process. *People v. Kilgore*, 992 P.2d 661, 663 (Colo. App. 1999). Similarly, a defendant's right to due process is violated if a trial court does not accord the accused an adequate hearing concerning his or her competency. *People v. Corichi*, 18 P.3d 807, 810 (Colo. App. 2000).

[Section 16-8-110(2)(a), C.R.S. (2007)] required a court to suspend any criminal proceeding whenever a question of defendant's competency to proceed was raised.
. . .

Wingfield requested a second competency hearing on seven occasions. First, in [the separate assault case], the division addressed Wingfield's contentions in relation to the March 12 and April 23, 2008, hearings. . . . [T]hese hearings addressed Wingfield's competency for the purposes of both trials, Therefore, we reject these contentions based on the division's reasoning in [the separate assault case].

Turning to Wingfield's new contentions, first, on April 10, 2008, after Wingfield moved for a second competency evaluation, the trial court did not suspend proceedings and make a preliminary determination of his competency. Additionally, on all seven occasions, the trial court did not notify the parties of a time within which to request a competency hearing, and therefore did not follow the [state statutory] procedures . . . .

Nevertheless, as in [the separate assault case], we again conclude that the trial court's statutory procedural error did not constitute plain error ["because Wingfield did not demonstrate that he raised a 'bond fide doubt' about his incompetence such that the trial court would have either ordered a second competency examination or held a competency hearing"].

Second, based on the division's reasoning in [the separate assault case], we conclude that the court did not abuse its discretion or violate Wingfield's due process rights when it denied his request for a second competency evaluation. On July 25, 2008; June 24, 2009; December 14, 2009; and December 15, 2009, the court took Wingfield's requests under advisement and issued rulings finding Wingfield competent to proceed, denying his request for a second competency hearing.

As in [the separate assault case], Wingfield relies on his history of mental illness and his general behavior throughout trial, including his attempted suicide, to argue that the trial court abused its discretion in denying his requests for a second competency examination. We again reject this argument…. Furthermore, the initial competency report concluded that Wingfield's behavior was under his volitional control and, on at least one occasion, he changed his mind, retracting his motion for a second competency evaluation.

Therefore, we conclude that while the trial court erred on several occasions in not making a preliminary finding of competency and setting a date within which to formally request a hearing, any error was not plain because Wingfield never submitted affidavits from psychiatrists or made offers of proof of his incompetency. We further conclude that the trial court did not abuse its discretion in denying Wingfield's request for a second competency examination.

(Doc. # 10-5 at 13-16).

## 2. Supreme Court law

"[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his [procedural] due process right to a fair trial." *Drope*, 420 U.S. at 172 (citing *Pate*, 383 U.S. 375). *See also McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001) (a procedural

competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing).   The U.S. Supreme Court has not "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure," *Drope*, 420 U.S. at 172, but *Pate* held that a hearing is required where the evidence before the trial judge raises a "bona fide doubt" as to a defendant's competence, *see* 383 U.S. at 385.   *See also Drope*, 420 U.S. at 172-73 (stating that the *Pate* Court "noted that under the Illinois statute a hearing was required where the evidence raised a 'bona fide doubt' as to a defendant's competence"); *Porter v. McKaskle*, 466 U.S. 984, 985–86 (1984) (Marshall, J., dissenting) ("It is settled that, if evidence available to a trial judge raises a bona fide doubt regarding a defendant's ability to understand and participate in the proceedings against him, the judge has an obligation to order an examination to assess his competency, even if the defendant does not request such an exam.") (citing *Drope* and *Pate*).

A bona fide doubt about a criminal defendant's competency exists when a reasonable judge should have doubted whether the defendant had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and whether petitioner had "a rational as well as factual understanding of the proceedings against him."   *McGregor*, 248 F.3d at 954 (quoting *Dusky*, 362 U.S. at 402). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required."   *Drope*, 420 U.S. at 180.   Other relevant factors include

evidence of mental illness and any representations of defense counsel about the defendant's incompetence. *Id.* at 177 n. 13 ("Although we do not . . . suggest that courts must accept without question a lawyer's representations concerning the competence of his client . . . an expressed doubt in that regard by one with the closest contact with the defendant . . . is unquestionably a factor which should be considered.") (internal quotations and citations omitted).

A state court's determination of competency is a factual finding entitled to a presumption of correctness on federal habeas review. *See Demosthenes v. Baal*, 495 U.S. 731, 735 (1990). Nonetheless, procedural competency imposes on the trial court a continuing duty to monitor the defendant's behavior. *See Drope*, 420 U.S. at 181. ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.").

In assessing a procedural competency claim, the federal must examine the totality of the circumstances: all evidence should be considered together, no single factor "stand[s] alone." *McGregor*, 248 F.3d at 955 (quoting *Drope*, 420 U.S. at 180) (internal quotation marks and citation omitted). The question is whether the trial court "fail[ed] to give proper weight to the information suggesting incompetence which came to light during trial." *Drope*, 420 U.S. at 179

### 3. AEDPA analysis

The Colorado Court of Appeals applied the correct legal standards for a procedural competency claim as articulated by the United States Supreme Court.

Therefore, the Court must decide whether the state appellate court's determination of Mr. Wingfield's constitutional claim constituted an unreasonable application of those standards or was based on an unreasonable determination of the facts.[4]

The state court record reflects that Mr. Wingfield was diagnosed by mental health care professionals during pre-trial proceedings as bipolar and schizophrenic and was prescribed medications for those conditions. However, a history of mental illnesses and use of psychotropic medication do not establish that Mr. Wingfield was incompetent to stand trial, without additional evidence that he lacked a present ability to consult with his lawyer and to understand the proceedings. *See Miles v. Dorsey*, 61 F.3d 1459, 1474 (10th Cir.1995). Both of Mr. Wingfield's pre-trial attorneys raised the issue of Applicant's competency and expressed concern about his ability to consult with them rationally about the proceeding. At Mr. Werking's request, Mr. Wingfield was afforded the opportunity to challenge Dr. Manguso's findings of competency with an evaluation from Dr. Mozer, his treating psychiatrist at the Arapahoe County Detention Facility, but Dr. Mozer did not render an opinion that Mr. Wingfield was incompetent. Mr. Wingfield did not make an offer of proof of his incompetence from any other mental health provider. *See Clayton v. Gibson*, 199 F.3d 1162, 1171 (10th Cir.1999) (emphasizing that prior medical opinions regarding an applicant's competency are "perhaps most important.").

---

4 Mr. Wingfield's allegation in claim six that the trial court failed to comply with Colorado statutory safeguards necessary to ensure against the prosecution of an incompetent defendant raises a state law issue not cognizable in this federal habeas corpus proceeding. *See Estelle*, 502 U.S. at 67-68.

The trial court relied, in part, on its own observations of Mr. Wingfield during the pre-trial proceedings in determining that he was competent. The court observed at an April 2008 hearing where the issue of Mr. Wingfield's competence was raised that he was able to articulate appropriate responses to the issues raised by the court. (R., 4/23/08 Hr. Tr. at 19). At a hearing on the first day of trial in December 2009, the trial court observed:

> Mr. Wingfield has been in front of me numerous times . . . as we tried to get this matter ready for trial as late as Friday of last week, when I noted that Mr. Wingfield was very engaged and even was pointing out that he believed that I had not correctly enforced the Yusem[5] opinion with regard to 404(b) and similar acts concerning whether or not the prosecution had sufficiently articulated evidentiary purposes.

> I have a competency evaluation from 2007 done by Dr. Manguso who has very high credentials, very experienced. And as far as I known, that competency evaluation was not challenged by Mr. Wingfield or Mr. Werking at a hearing, which is allowed under 16-8.5-102.

> Then for trial in front of Judge Macrum, which I take it was earlier this year, there was a situation, the particulars of which I don't recall, but would up with Dr. Mo[ze]r, a trained psychiatrist opinion, in essence, that he was satisfied that Mr. Wingfield could participate and causing Mr. Wingfield to withdraw his motion for a competency evaluation, and though Mr. Wingfield, I understand, understandably disagrees with the outcome, there was somewhat of a successful outcome in that case.

> The inference I take from that is that Mr. Wingfield has successfully participated in two trials, was in my view, fully engaged in the pretrial motions leading up to this case, even to have a somewhat sophisticated knowledge of the 404(b) issue, which is of course the predominant issue in this case.

---

5 *Yusem v. People*, 210 P.3d 458, 464 (Colo. 2009) (stating that for other acts evidence to be admissible, "the prosecution must identify the specific purpose for which the evidence will be used and explain how the proffered evidence establishes that purpose independent of the inference forbidden by CRE 404(b)").

And because of all of that, when I add in Dr. Sather's and Ms. Sivak's opinions, I do not have any concern about competency at this point in time.

Certainly I agree with Ms. O'Neill, suicide ideation here has arisen. He is, for the record, his left wrist is bandaged and I believe he's been sutured for a laceration on his left arm.

Dr. Sather, who is a psychologist, not a psychiatrist, therefore she's not authorized to prescribe medication, but has a Ph.D. in psychology, I do rely on her telling me that she did not see any signs of an overdose of Seroquel, which was anecdotally reported to me today, and again the circumstances of that I don't know, but she doesn't see any signs of an overdose of Seroquel based on hers and Ms. Sivak's interaction.

But I further note, I'm sorry, they both know Mr. Wingfield, he's been at the Arapahoe County Detention Center for two years plus, so they're very familiar with his record and they as professionals, but not having done a competency evaluation, they consider him safe to participate in court proceedings, noting that we're going to have a daily evaluation of his situation.

And for that, the defense motion for vacating the trial in order to conduct a second competency evaluation would be denied at this point in time.

(R., 12/14/09 Hrg. Tr. at 35-37).

After counsel renewed her request for a second competency evaluation the following day, the trial court stated:

I would note I've been seeing Mr. Wingfield on and off for over approximately two years now at one time or another, that Mr. Wingfield in my view has always been oriented to time and place and person. He has a – as I noted yesterday, he has an excellent grasp of the 404(b) issue and the Yusem case and has an ability that I've seen so far to furnish accurate information with regard to his past history to be able to consult with his attorneys to assist them, noting again an important point to me, Mr. Wingfield has been relatively successful. I understand his frustrations with being convicted of the escape charge, but in two trials so far his attorney, Mr. Werking, with his assistance, has been relatively successful when you look at the normal rate of convictions and I have no indication since Ms.

O'Neill accepted appointment here that he hasn't assisted her with coming up with new and innovative points. We've gone over the standing issue a couple of times now and I think some of that comes from Mr. Wingfield and he has every right to raise it as a legal issue, so I believe he can accurately and has accurately furnished information with regard to his past history and the events at issue in this particular situation and because of his relative success in those other trials, he's been able to provide helpful information for the events at issue in those trials.

Everything I've seen of Mr. Wingfield, his perceptions and understandings appear to me to be rational and grounded in reality. The fact that he yesterday wanted to proceed pro se, I disagree with but I don't find that to be an irrational opinion. That's an opinion that -- or a decision that he has to make at this point in time and that's -- I disagree with that decision, but all of his other decisions I agree with. I think he's employed good tactics trying to limit the prosecution's case and as he has every right to do.

Ms. O'Neill, you have renewed your motion because Mr. Wingfield this morning has told you that he does not trust you; however, that I have to find is a theme I've heard before from Mr. Wingfield. It's his primary theme for getting me to discharge Mr. Werking and that's Mr. Wingfield's right at this point in time. If he doesn't wish to trust you and wishes to proceed pro se, he'll have to bear the consequences of that, but I don't see that as evidence of incompetency.

(R., 12/15/09 Trial Tr. at 9-11).   The trial court further noted that based on the court's observations of the past six months, it seemed that Mr. Wingfield had "been able to assist [counsel] regarding the events of the past" and that the court gave "great credence" to Dr. Manguso's opinion that Mr. Wingfield "engages in maladaptive behavior deliberately."   (*Id.* at 12-13).

The state court record demonstrates that although Mr. Wingfield frequently expressed his belief that he was the victim of a conspiracy, for the most part, he conducted himself professionally throughout the proceedings and complied with procedural rules.   Mr. Wingfield communicated effectively and intelligently with the trial

court, understood the factual nature of the charges against him, the elements of the charged offenses, the possible penalty for conviction, and his rights as explained by the trial court.   At trial, Mr. Wingfield participated in jury selection, asking the prospective jurors questions consistent with his defense (R., 12/15/09 Trial Tr. at 158, 165-66); made a rational opening statement (12/16/09 Trial Tr. at 66-79); cross-examined witnesses and elicited testimony that was helpful to his defense (12/22/09 Trial Tr. at 183); called witnesses to testify for the defense (R., 12/22/09 Trial Tr. at 85, 95, 139, 156, 166); testified in his own defense (*id.* at 189-230); and argued in closing that although he used methamphetamine and associated with people who used and manufactured it, he was not involved in the manufacturing process in the motel room. (R., 12/23/09 Trial Tr., morning session, at 150-185).   Near the conclusion of the trial, the trial court observed that Mr. Wingfield "conducted this trial on an amazingly sophisticated level."   (R., 12/22/09 Trial Tr. at 183).

Mr. Wingfield's behavior at trial was consistent with competency, not incompetency.   *See Lay v. Royal*, 860 F.3d 1307, 1314-15 (10th Cir. 2017) (denying relief on petitioner's procedural competency claim because, although petitioner "at times shared with the jury his unusual and conspiratorial beliefs, he conducted himself professionally throughout the proceedings and complied with procedural rules"; he interacted with the trial court; and, "he understood the charges against him, the range of punishment he faced, and his rights as explained by the trial court"); *Allen v. Mullin*, 368 F.3d 1220, 1239 (10th Cir. 2004) (finding that petitioner was not procedurally incompetent because "he appeared cogent and rational in colloquy with the court," and

"gave every indication he understood the rights the court explained to him"); *Bryson v. Ward*, 187 F.3d 1193, 1203 (10th Cir. 1997) (rejecting procedural competency claim where the trial court failed to consider an affidavit from a psychiatrist that the petitioner might be incompetent, but the trial court's observations and interactions with the petitioner gave the trial court no reason to question the petitioner's competency; the petitioner "responded rationally, coherently and lucidly to the court's questions, understood the factual nature of the proceedings against him and the possible penalties; and was able to assist counsel).   In light of the trial court's independent observations of Mr. Wingfield's behavior in the months leading up to trial, Mr. Wingfield's attempted suicide on the first day of trial does not change the analysis.   *See Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir.1999) (concluding that a state appellate court was not unreasonable in determining that there was no doubt as to defendant's competency despite a suicide attempt during the trial because the trial court had made independent observations of defendant's demeanor and concluded that he was competent).

Mr. Wingfield relies on the Tenth Circuit's *en banc* decision in *McGregor*, 248 F.3d 946, in support of his claim of procedural incompetency.   In *McGregor*, the Circuit Court determined that a reasonable judge should have had a bona fide doubt concerning the defendant's continued competency to stand trial, *id.* at 955, based on the following:   The psychiatric expert testimony established that McGregor had a substantial history of mental illness and was competent to stand trial *so long as* he remained properly medicated, but his medication use was inconsistent.   248 F.3d at

956.   In addition, McGregor's behavior throughout the trial was "unusual and inappropriate" for an individual facing a likely capital sentence.   *Id.* at 958. Specifically, McGregor had a temper tantrum about the shirt he was wearing on the first day of trial; he asked jurors during voir dire whether they wanted to play a one-on-one game of basketball with him; he was disoriented about his surroundings on the second day of voir dire; he experienced a blackout out the jail on the morning of the third day of trial; he refused to take his Thorazine on the fifth day of trial, which caused him to have to leave to courtroom and he did not return in the afternoon until sheriff's deputy woke him up in his cell; and, on the eighth day of trial, defense counsel informed the court that McGregor was "complaining of some sort of problems medically or mentally" and that counsel thought he had been having flashbacks and blackouts earlier that morning.   *Id.* at 959.   The Tenth Circuit concluded that the "sum total" of the evidence concerning McGregor's medication use and behavior demonstrated a question as to his competency at trial.   *Id.*   The Circuit Court then found that counsel's concerns further reinforced a reasonable doubt about McGregor's competency.   Defense counsel was adamant throughout McGregor's trial that he was incompetent because McGregor was unable to focus, unable to assist in his own defense, was disoriented, and talked nonsense.   *Id.* at 960-61.   The *McGregor* court also found that the trial court's failure to notice any changes in McGregor's behavior was not probative of McGregor's ability to aid in his own defense because "the court very rarely interacted with McGregor verbally."   *Id.* at 962.

The present action is factually distinguishable from *McGregor*.   During Mr. Wingfield's criminal proceeding, no mental health care professional ever testified or opined that Mr. Wingfield was competent only if he took certain medications; the trial court questioned Applicant about his medications and was satisfied that he was competent to proceed; Mr. Wingfield's behavior at trial for the most part was professional and appropriate; and, although both Mr. Werking and Ms. O'Neill raised concerns about Applicant's ability to assist in his defense because of mental health issues, no expert testimony was ever offered by the defense to challenge Mr. Wingfield's competence.   *See Bryson*, 187 F.3d at 1201 (recognizing that "the concerns of counsel alone are insufficient to establish doubt of a defendant's competency.").   Moreover, because Mr. Wingfield was *pro se* during part of the pre-trial proceedings, the trial court interacted with him verbally on several occasions and made detailed findings that Mr. Wingfield's behavior and interactions with the court reinforced the original competency determination.

Although it may be a close question, based on the totality of the evidence in the state court proceeding, the Court finds that, at a minimum, fair-minded jurists could disagree as to whether the evidence raised a bona fide doubt as to Mr. Wingfield's competency at the time of his trial.   Therefore, the Colorado Court of Appeals' resolution of the procedural competency claim did not constitute an unreasonable application of *Drope* or *Pate*.   Further, the Court has carefully reviewed the state court record and finds that the state appellate court's determination that Mr. Wingfield failed to

raise a bona fide doubt about his incompetence was based on a reasonable

determination of the facts and evidence presented to the trial court.

Mr. Wingfield's sixth claim will be dismissed.

## F. Claim 7

For his seventh claim, Mr. Wingfield argues that the trial court violated his due

process right to a fair trial by allowing him to represent himself, while incompetent,

throughout the seven-day trial.   (*See* Opening Brief in *Wingfield I*, Doc. # 10-3 at 3).

### 1. State court proceeding

In *Wingfield I,* the Colorado Court of Appeals rejected Mr. Wingfield's claim on

the following grounds:

> Above, we concluded that the trial court did not abuse its discretion
> when it found, on repeated occasions, that Wingfield was competent to
> stand trial.   Our inquiry here is whether Wingfield, although competent to
> stand trial, was incompetent to represent himself.   We conclude that the
> trial court did not abuse its discretion when it found Wingfield competent to
> represent himself at trial.
>
> To be sure, throughout trial, Wingfield was being treated for mental
> health issues, rambled, made inappropriate comments, and became upset
> and expressed paranoid thoughts when the court denied his motions.
> However, the record suggests that he was capable of carrying out the
> basic tasks needed to present his defense without counsel.   Wingfield
> cites statutes and case law in support of his arguments, and filed several
> motions with the court.
>
> Further, he presented evidence to support a consistent and
> coherent defense that, although he frequently used methamphetamine
> and associated with dealers, he was not making the drug in the motel
> room the evening of his arrest.   Wingfield partially succeeded in
> defending against the charges.   The jury acquitted him of conspiracy to
> commit possession of chemicals or supplies to manufacture a schedule II
> controlled substance and solicitation to commit possession of a precursor
> for methamphetamine or amphetamine.

Therefore, we conclude that the trial court did not abuse its discretion when it permitted Wingfield to represent himself at trial.

(Doc. # 10-5 at 18-19).

## 2. Supreme Court law

A defendant in a criminal proceeding has a constitutional right to waive his right to counsel and represent himself. *Faretta v. California*, 422 U.S. at 821-832. A defendant choosing self-representation must do so "'competently and intelligently.'" *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Faretta*, 422 U.S. at 835).

In the context of a criminal defendant's waiver of the right to counsel, the competency analysis focuses on the defendant's ability to understand the proceedings and is the same standard used to determine whether a defendant is competent to stand trial. *Godinez*, 509 U.S. at 398; *see also Lay*, 860 F.3d at 1316 (citing *United States v. DeShazer*, 554 F.3d 1281, 1288 (10th Cir. 2009)); *Maynard v. Boone*, 468 F.3d 665, 676-77 (10th Cir. 2006).

In *Indiana v. Edwards*, 554 U.S. 164 (2008), the Supreme Court addressed the question of whether the Constitution requires states to respect the self-representation rights of a defendant who meets *Dusky*'s basic mental competence standard but who lacks the mental capacity to conduct his trial defense without the assistance of counsel. *Id.* at 174. The Supreme Court observed:

> In certain instances an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work without counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel.

*Id.* at 175-76. However, the Supreme Court did not hold that a higher standard of

mental competence was constitutionally required for self-representation.    Instead, the

Court concluded

> that the Constitution permits judges to take realistic account of the
> particular defendant's mental capacities by asking whether a defendant
> who seeks to conduct his own defense at trial is mentally competent to do
> so. That is to say, the Constitution permits States to insist upon
> representation by counsel for those competent enough to stand trial under
> *Dusky* but who still suffer from severe mental illness to the point where
> they are not competent to conduct trial proceedings by themselves.

*Id.* at 177-78.

### 3. AEDPA analysis

The state courts' factual determination that Mr. Wingfield was competent to stand

trial is presumed correct, *see Demosthenes*, and Applicant fails to point to any clear and

convincing evidence to the contrary in the state court record.

Under *Edwards*, the state can force counsel upon a defendant who is competent

under *Dusky* but who is incapable of representing himself at trial.    However, neither

*Edwards*, nor any other Supreme Case, holds that the Constitution is violated if the trial

court allows a defendant who meets only the *Dusky* standard to waive counsel and

represent himself at trial.    *See DeShazer*, 554 F.3d at 1290 (*Edwards* "reaffirmed that a

court may constitutionally permit a defendant to represent himself so long as he is

competent to stand trial."); s*ee also Wright v. Bowersox*, 720 F.3d 979, 986 (8th Cir.

2013) ("it would not be an unreasonable determination of clearly established federal law

for the state court to decline to impose a heightened standard of competency, as

*Edwards* announced no such requirement."); *United States v. Bernard*, 708 F.3d 583,

590 (4th Cir. 2013) (a defendant who is competent to stand trial may waive his Sixth

Amendment right to counsel and represent himself despite his "questionable mental competence" because the higher competence standard addressed in *Edwards* was expressly made permissive and is not constitutionally mandated); *United States v. Ferguson*, 560 F.3d 1060, 1070 n.6 (9th Cir. 2009) (*Edwards* permits, but does not compel, a trial court to require representation by counsel for a defendant who lacks mental competency to conduct trial proceedings).

Mr. Wingfield argues in his Reply that the only reason he elected to proceed *pro se* on the first day of trial is because jail officials had placed him in "the rubber room" because of his suicide attempt that morning. (Doc. # 63 at 13). However, this allegation is insufficient to show that Mr. Wingfield was incompetent at the time he waived his right to counsel (after receiving a thorough advisement from the trial court).[6]

Mr. Wingfield fails to demonstrate that the Colorado Court of Appeals' resolution of his claim was contrary to, or an unreasonable application of Supreme Court law, or was based on an unreasonable determination of the facts.

Claim seven will be dismissed.

## G. Claim Eight

In claim eight, Mr. Wingfield contends that the trial court violated his constitutional right to a fair trial and to present a defense when it refused to grant him access to the discovery during trial. (*See* Opening Brief on Appeal in *Wingfield I*, Doc. # 10-2 at 12).

_____

6  *See* R., 12/15/09 Trial Tr. at 14-23.

**1. State court proceeding**

In *Wingfield I*, the Colorado Court of Appeals resolved Mr. Wingfield's claim on the following grounds:

> Wingfield contends that the trial court abused its discretion when it denied his request for discovery on the first day of trial. Specifically, he claims that the court denied him access to the prosecution's list of witnesses and their statements, as well as approximately 1800 pages of unspecified discovery. We disagree.
>
> A. Standard of Review
>
> "We review a trial court's resolution of discovery issues for an abuse of discretion." *People v. Bueno*, 2013 COA 151, ¶ 10, __ P.3d __, __ (internal quotation marks omitted).
>
> B. Applicable Law
>
> Although "[t]here is no general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 18 (1977), a defendant must be provided with all favorable information that is material to guilt or punishment, *People in Interest of A.D.T.*, 232 P.3d 313, 316 (Colo. App. 2010).
>
> C. Analysis
>
> The record shows that the court did not deny Wingfield access to the prosecution's list of witnesses and their statements, and suggests that Wingfield in fact had access to the list. Nor did the court deny him access to 1800 pages of discovery. On the first day of trial, Wingfield told the court that "at the very least, [he] should have access to . . . [his] discovery." He further told the court that he had never seen the prosecution's "list of witnesses." The court told Wingfield that although it was unaware whether discovery had been shared with him, as far as it knew, "discovery[] [had been] provided to [his] counsel." Wingfield made no indication that he had asked his former attorney for either the witness lists or the 1800 pages, and, prior to the first day of trial, never notified the court that his former attorney was preventing him from reviewing them. Additionally, the record suggests that Wingfield did have access to the prosecution's list of adverse witnesses and their statements. On the third day of trial, Wingfield complained of the amount of discovery he had to

> review, telling the court that it took him "three or four hours" to go through "every discovery and pull out" witness statements. Therefore, we conclude that the trial court did not deny Wingfield access to either the prosecution's list of witnesses and their statements, or the 1800 pages of discovery.

(Doc. # 10-5 at 18-20).

### 2. Supreme Court law

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the prosecution's suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment. However, aside from evidence that must be disclosed pursuant to *Brady*, "there is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

### 3. AEDPA analysis

The Colorado Court of Appeals' factual finding that Mr. Wingfield had access to the prosecution's list of witness and the 1800 pages of discovery is supported by the state court record. (*See* Hrg. Tr. 12/16/09 Trial Tr. at 23, 27; 12/17/09 Trial Tr. at 5-6). Mr. Wingfield does not point to any clear and convincing evidence to the contrary. Indeed, Mr. Wingfield acknowledges in his Reply brief that he received the discovery from his advisory counsel (formerly his appointed counsel) on the second day of trial, *see* Doc. # 63 at 14), after he waived counsel and elected to proceed *pro se* on the first day of trial. Further, in his direct appeal proceeding, Mr. Wingfield alleged a denial of discovery generally, without identifying any specific exculpatory information that the prosecution failed to disclose. (Doc. # 10-3 at 12).[7] Consequently, Mr. Wingfield has

---

7 Mr. Wingfield asserts in his Reply brief that he was denied exculpatory information relating to the

failed to show that the state appellate court's determination of his claim was contrary to or an unreasonable application of Supreme Court law or was based on unreasonable determination of the facts.

Claim eight will be dismissed.

## H. Claim Nine

For his ninth claim, Mr. Wingfield contends that the trial court violated his due process right to a fair trial when he was forced to defend against "other acts" evidence admitted improperly under Colo. R. Evid. 404(b). (*See* Opening Brief in *Wingfield I*, Doc. # 10-3 at 13). Mr. Wingfield asserts in sub-claim 2(b) that pre-trial counsel was ineffective in failing to investigate the 404(b) evidence and challenge the admission of conduct for which other persons were charged and convicted. (Doc. # 1 at 10-13).

### 1. State court proceeding

Before trial, the prosecutor filed a notice of intent to introduce evidence of other transactions, pursuant to Colorado Rule of Evidence 404(b). (R., Court File, at 547). The incidents resulted in the filing of criminal charges against Mr. Wingfield in other jurisdictions:

> (1) Jefferson County District Court Case No. 00CR35 (Mr. Wingfield charged with manufacturing a controlled substance; he pleaded guilty to possession of a controlled substance);

---

constitutionality of the search of the motel room where incriminating evidence was seized, as well as the criminal histories for prosecution witnesses that were relevant for impeachment purposes. (Doc. # 63 at 14). However, Mr. Wingfield did not raise these specific allegations on direct appeal before the Colorado Court of Appeals, and, therefore, he is procedurally barred from federal habeas review of the unexhausted allegations. *See Coleman v. Thompson,* 501 U.S. 722, 735 n.1 (1991). Mr. Wingfield has not demonstrated cause and prejudice for his procedural default.

(2) Jefferson County District Court Case No. 01CR1224 (Mr. Wingfield charged with possession of incendiary devices in facilities of public transportation; he pleaded guilty to criminal attempt to possess a controlled substance);

(3) Denver District Court Case No. 05CR5720 (Mr. Wingfield charged with possession of chemicals or supplies to manufacture a controlled substance, manufacturing a controlled substance, possession of a precursor for methamphetamine and conspiracy to manufacture a controlled substance; charges were dismissed)

(4) Adams County District Court Case No. 05CR1917 (Mr. Wingfield charged with manufacturing a scheduled II controlled substance, possession of a Schedule II controlled substance, possession of precursor for methamphetamine, and possession of chemicals or supplies to manufacture a controlled substance; he pleaded guilty to a class 6 felony)

(5) Clear Creek County District Court 07CR32 (Mr. Wingfield charged with possession of materials to manufacture methamphetamine and possession with intent to distribute a schedule II controlled substance; charges were dismissed)

(*Id.* at 548-551; 11/21/08 Hrg Tr. at 5, 19; 11/13/09 Hrg. Tr. at 4; 12/21/09 Trial Tr. at 97).

Following a hearing, the trial court ruled that the other acts evidence was relevant and not unduly prejudicial and that the evidence was admissible under Colorado Rule of Evidence 404(b) for the limited purposes of proving modus operandi and a common plan or scheme to manufacture and distribute methamphetamine. (R., 11/21/08 Hr. Tr. at 18-24). The evidence was admitted at trial, with contemporaneous instructions to the jury that the evidence was to be considered only for the limited purpose of proving common plan or scheme and modus operandi. (*See, e.g.*, R., 12/17/09 Trial Tr. at 162). The jury was instructed again before deliberations that evidence admitted for the

limited purposes of common plan or scheme and modus operandi could only be considered for those limited purposes.   (R., Court File at 740, Instruction No. 14).

On direct appeal, Mr. Wingfield argued that the trial court erred in admitting the evidence because: (1) the prior acts' relevance was not independent of the prohibited inference that he has a bad character because the prior acts were too dissimilar to be probative of a common plan or scheme or to establish a modus operandi. (Doc. # 10-3 at 22-25); and, (2) the prior acts were too remote in time to constitute common plan evidence (*id.* at 24-25).

The Colorado Court of Appeals found that the prior acts were not too dissimilar from the charged act to constitute common plan or scheme evidence because the prior acts "all involved Wingfield in possession of methamphetamine or its precursor chemicals, demonstrating that Wingfield knew how to produce methamphetamine . . . and established a pattern of behavior that is probative of his common plan or scheme to manufacture the drug."   (*Wingfield I*, Doc. # 10-5 at 25-26).   The state appellate court further concluded that the prior acts were not too remote in time from the charged act to be admissible because "the most recent [prior act] occurred only two years prior to the charged act" and "the remoteness of some of the prior acts is less significant because Wingfield was incarcerated during the intervening years."   (*Id.* at 26).   The Colorado Court of Appeals determined that the trial court "did not abuse its discretion in finding that the prior acts were probative of Wingfield's common plan to manufacture and distribute methamphetamine."   (*Id.* at 27).

Mr. Wingfield also argued on direct appeal that the probative value of the prior acts was substantially outweighed by the risk of unfair prejudice, and that he was forced to defend against an "extraordinary amount of 404(b) evidence" that included the testimony of 19 404(b) witnesses.   (Doc. # 10-3 at 25-26).   Again, the Colorado Court of Appeals disagreed.   The state appellate court determined:

> As discussed above, the probative value of the other act evidence was substantial.   It proved Wingfield's scheme to manufacture and sell methamphetamine, directly refuting his defense that he was not part of the methamphetamine operation discovered in the motel room.   Furthermore, any prejudice suffered by Wingfield was not unfair.   The prosecution sought admission of Wingfield's prior acts of manufacturing methamphetamine in order to counter his theory of defense.   Additionally, the trial court instructed the jury that the evidence was admissible for the limited purpose of proving common plan or scheme and modus operandi. Therefore, we conclude that the probative value of the prior act evidence was not outweighed by the risk of unfair prejudice, confusion of the issued, misleading the jury, wasting time, or needless presentation of cumulative evidence.

(Doc. # 10-5 at 27-28).

### 2. Supreme Court law

Federal habeas review does not lie to correct errors of state law.   *See Estelle*, 502 U.S. at 67-68.   *See also Spears v. Mullin*, 343 F.3d 1215, 1225 (10th Cir. 2003) ("Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights.").   In determining whether the admission of evidence violated the Constitution, the sole question is whether the evidence is "'so unduly prejudicial that it renders the trial fundamentally unfair.'" *Lott v. Trammell*, 705 F.3d 1167, 1190-1191 (10th Cir. 2013) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).   *See also Dowling v. United States,* 493 U.S. 342, 352 (1990) (the introduction

of evidence fails the due process test of "fundamental fairness" only if the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice.") (internal quotation marks and citation omitted). "Inquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner. . . . " *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (citing *Donnelly v. DeChristophoro*, 416 U.S. 637, 643 (1974)). "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." *Duckett*, 306 F.3d at 999.

### 3. AEDPA analysis

Under Colorado law, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Colo. R. Evid. 404(b). However, other acts evidence is admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Before admitting other acts evidence, the trial court must be satisfied that (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the evidence's relevance is independent of the prohibited inference that the defendant was acting in conformity with his bad character; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990).

The state court record supports the Colorado Court of Appeals' determination that the Rule 404(b) evidence presented at Mr. Wingfield's trial, although lengthy, was relevant to the possession and conspiracy offenses with which he was charged and was admissible for the limited purposes allowed by the trial court. The evidence was also prejudicial to Mr. Wingfield, but the record does not demonstrate that it was unfairly prejudicial. *See Sanborn v. Parker*, 629 F.3d 554, 576 (6th Cir. 2010) (recognizing that "mere prejudice to a defendant does not mean that such prejudice is unfair; indeed, all evidence tending to prove guilt is prejudicial to a criminal defendant. If it were otherwise, the State would not produce it as evidence and the court would not admit it as relevant.") (internal quotation marks and citation omitted). Moreover, the trial court instructed the jury to consider the other acts evidence only for the specified, limited purpose of showing a common plan or scheme, and modus operandi, and for no other purpose. The Court presumes that the jury followed the limiting instructions given by the trial court both when the evidence was introduced and in the final instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the existence of an "almost invariable assumption of the law that jurors follow their instructions"). Thus, any potential for unfair prejudice stemming from introduction of this evidence was minimized.

On the whole, the state court record does not compel the conclusion that the admission of the other acts evidence for the limited purposes specified by the state trial court rendered Mr. Wingfield's trial fundamentally unfair so as to constitute a denial of his federal due process rights. The Court thus finds that the Colorado Court of

Appeals' determination of the Rule 404(b) claim was not so lacking in justification under applicable Supreme Court law as to be beyond any possibility of fair-minded disagreement.   Further, Mr. Wingfield has failed to demonstrate the state court decision was based on an unreasonable determination of the facts.

Claim nine will be dismissed.

### 4. Ineffective assistance claim

The underlying premise for the ineffective assistance allegation in sub-claim 2(b) is not the same as the premise underlying claim 9 of trial court error.   In sub-claim 2(b), Mr. Wingfield contends that pre-trial counsel should have discovered and presented evidence to challenge the admission of other acts evidence which related to criminal charges that were dismissed against him before trial.   (Doc. # 1 at 10-13).   He maintains that pre-trial counsel's deficient performance prejudiced him by forcing him to defend against 404(b) crimes that he did not commit.[8]   (*Id.*).

The state court record reflects the following.   At a pre-trial motions hearing on November 21, 2008, the trial court ruled that the prosecution could introduce other acts evidence relating to two pending criminal cases that had not yet been resolved, pursuant to the Colorado Supreme Court's decision in *People v. Skufca*, 176 P.3d 83 (Colo. 2008).[9]   (R., 11/21/08 Hrg. Tr. at 20-22).   At a subsequent hearing, defense

---

8  To the extent Mr. Wingfield purports to include these new factual allegations in claim 9 (trial court error), he is procedurally barred from doing so because he did not raise the allegations in his opening brief filed with the Colorado Court of Appeals in *Wingfield I*.   (*See* Doc. # 10-3 at 13-28; *see also* Doc. # 42 at 4).

9  In *Skufka*, the Colorado Supreme Court held that evidence concerning the defendant's involvement in drug transactions on the morning of his arrest on the current drug charges was admissible as res gestae evidence at defendant's trial. 176 P.3d at 86-87.

counsel O'Neill informed the trial court that the charges in one of the 404(b) cases had been dismissed, but she did not make any argument as to the admissibility of the evidence. (R., 11/13/09 Hrg. Tr. at 4). During trial, the trial court granted the prosecution's verbal motion in limine to exclude the admission of the results of the Rule 404(b) cases. (R., 12/16/09 Trial Tr. at 34). Mr. Wingfield then argued that the jury should be informed that criminal charges filed against him in two of the 404(b) cases were dismissed, pursuant to the reasoning of *People v. Kinney*, 187 P.3d 548, 554, 557 (Colo. 2008).[10] The trial court disagreed and ruled that the results of the Rule 404(b) cases were irrelevant. (*Id.* at 35).

The trial court rejected Mr. Wingfield's argument, during trial, that the jury should be informed about the dismissal of criminal charges relating to the 404(b) evidence. Pre-trial counsel's failure to make the same argument before trial that Mr. Wingfield made and lost during trial did not result in any prejudice. Moreover, Mr. Wingfield does not cite any Colorado case law, other than *Kinney*, that pre-trial counsel should have argued that would have persuaded the trial court to admit the results of the dismissed cases at trial. Consequently, Mr. Wingfield has failed to demonstrate a reasonable probability that the outcome of his trial would have been different had pre-trial counsel

---

10 In *Kinney,* the Colorado Supreme Court held that a trial court should determine whether to give an acquittal instruction or permit other evidence of acquittal on a case-by-case basis when admitting evidence of a prior act that gave rise to a charge on which defendant was acquitted. 187 P.3d at 557. The *Kinney* court further stated that "[a]n acquittal instruction is appropriate when the testimony or evidence presented at trial about the prior act indicates that the jury has likely learned or concluded that the defendant was tried for the prior act and may be speculating as to the defendant's guilt or innocence in that prior trial." *Id.*

advocated for the admission of evidence concerning the dismissal of criminal charges in two of the 404(b) cases.

The Court finds that sub-claim 2(b) is not substantial under *Martinez*, and, therefore, the claim is dismissed as procedural defaulted. Alternatively, the Court finds that sub-claim 2(b) is subject to dismissal on the merits.

## I. Claims 10, 11 and 12

In claims 10 and 11, Mr. Wingfield asserts that direct appeal counsel was ineffective in failing to raise the following issues on appeal: the trial court denied Mr. Wingfield the ameliorative effect of a subsequent change in the law related to the drug crimes for which he was convicted (claim 10); and, the trial court improperly relied on an attempted escape conviction as a predicate conviction for habitual offender sentencing (claim 11). In claim 12, Mr. Wingfield asserts that direct appeal counsel was ineffective in failing to raise issues Mr. Wingfield wanted to pursue on appeal and in refusing to allow him to assist in the appeal. (*See Wingfield II*, Doc. # 10-9, at 10-12).

### 1. State court proceeding

In *Wingfield II*, the Colorado Court of Appeals rejected the underlying premise of claim 10 on state law grounds:

> [T]he trial court concluded that Wingfield was not entitled to the benefit of subsequent changes in the law amending the sentence range for the drug crimes for which he was convicted. As noted by the trial court, the legislature expressly provided that the amendments "only apply to a conviction for a drug felony offense . . . committed on or after October 1, 2013." § 18-1.3-401.5(1), C.R.S. 2018. Thus, the amendments had only prospective effect. Because Wingfield committed the drug offenses for which he was prosecuted in this case several years before the new law took effect, his claim failed as a matter of law. We agree with the trial

court.

(Doc. # 10-9 at 11).

As for claim 11, the state appellate court determined:

As to the second claim, the trial court correctly concluded that the use of an attempted escape conviction as a predicate offense had no bearing on Wingfield's habitual offender status. At the habitual offender sentencing proceeding, the People established four prior felony convictions, only one of which was for an attempted escape. The three remaining offenses were not statutorily precluded from treatment as habitual predicate offenses. Since only three prior convictions are required, the attempted escape conviction was of no import.

(*Id.* at 10-11).

The Colorado Court of Appeals rejected claim 12 on the following grounds:

Finally, we agree with the trial court's conclusion that Wingfield's challenge to his attorney's lack of preparedness and unwillingness to pursue all of Wingfield's claims was insufficiently pleaded. Wingfield failed to set forth with any specificity what appellate claims that were not pursued would have been more successful than those counsel did raise. *See People v. Trujillo,* 169 P.3d 235, 238-39 (Colo. App. 2007) (affirming the denial of a postconviction petition without a hearing where the defendant failed to articulate that specific unasserted appellate claims "were stronger or had a better chance of prevailing" than the claims appellate counsel chose to pursue). Nor does he assert any facts that, if true, would demonstrate that counsel's alleged lack of review of the record was in any way prejudicial to Wingfield.

(*Id.* at 11).

**2. Supreme Court law**

The two-part standard set forth in *Strickland v. Washington* applies to claims of ineffective assistance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding that "the proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*"). The applicant must show, under

66

the first prong of *Strickland*, "that [appellate] counsel unreasonably failed to discover [a] nonfrivolous issue[ ] and to file a merits brief raising [it]." *Smith*, 528 U.S. at 285. *See also Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003) ("The very focus of a *Strickland* inquiry regarding performance of appellate counsel is upon the merits of omitted issues, and no test that ignores the merits of the omitted claim in conducting its ineffective assistance appellate counsel analysis comports with federal law.").

Under the second prong of *Strickland*, the applicant "must show a reasonable probability that, but for his counsel's unreasonable failure to" raise a particular nonfrivolous issue, "he would have prevailed on his appeal." *Smith*, 528 U.S. at 285.

### 3. AEDPA analysis

The Colorado Court of Appeals resolved claims 10 and 11 on state law grounds and this Court must defer to the state courts' interpretation of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (recognizing that a federal habeas court is bound by a state appellate court's determination of issues of state law) (citing *Estelle*, 502 U.S. at 67-68). Further, the state appellate court's factual finding that the habitual offender adjudication was supported by three convictions other than the attempted escape conviction is supported by the state court record. (*See* R., 1/17/12 Hrg. Tr.; 5/4/12 Hrg. Tr. at 21-22). Appellate counsel's failure to raise the substance of claims 10 and 11 on direct appeal was not objectively unreasonable because the claims lacked merit. *See Johnson v. Carpenter,* 918 F.3d 895, 902-03 (10th Cir. 2019); *Wood v. Carpenter*, 907 F.3d 1279, 1304 (10th Cir. 2018).

With regard to claim 12, the Court of Appeals denied relief because Mr. Wingfield

failed to identify what specific issues he wished to pursue that appellate counsel failed to raise.    The state appellate court's determination was consistent with *Strickland.*

*See Cummings v. Sirmons,* 506 F.3d 1211, 1233-1234 (10th Cir. 2007) (rejecting ineffective-assistance claim because "[w]ithout a more precise identification of what [deficiencies petitioner] is referring to," no prejudice can be found)**;** *Snow v. Sirmons*, 474 F.3d 693, 724-25 (10th Cir. 2007) (rejecting ineffective-assistance claim where habeas petitioner failed to indicate "why counsel's failure to object to the evidence was deficient . . . '").    *See also Strickland*, 466 U.S. at 693 (requiring a defendant to "affirmatively prove prejudice" in order to demonstrate that counsel's assistance was constitutionally ineffective).

The Court finds that the Colorado Court of Appeals' determination of claims 10, 11 and 12 comported with *Strickland.*    The issues lacked merit under state law or were too vague to analyze, and Mr. Wingfield has failed to demonstrate that he was prejudiced as a result of appellate counsel's failure to raise the issues.

Claims 10, 11 and 12 will be dismissed.

## IV. CONCLUSION

For the reasons discussed above, it is

ORDERED that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Doc. # 1), filed *pro se* by Joshua E. Wingfield, is DENIED and this action is DISMISSED WITH PREJUDICE.    It is

FURTHER ORDERED that no certificate of appealability shall issue because Mr. Wingfield has not made a substantial showing of the denial of a constitutional right. 28

U.S.C. § 2253(c)(2); Fed. R. Governing Section 2254 Cases 11(a); *Slack v. McDaniel*,

529 U.S. 473, 483-85 (2000).

DATED March 13, 2020.

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge